IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

COURTNEY AUSTIN,

     Plaintiff,

v.                //   CIVIL ACTION NO. 1:13CV135
                           (Judge Keeley)

PRESTON COUNTY COMMISSION
and CRAIG JENNINGS, individually,

     Defendants.

MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 41]

Before the Court is the motion for summary judgment (dkt. no. 41) filed by the defendants, the Preston County Commission ("the Commission"), the governing body of Preston County, West Virginia, and Craig Jennings ("Jennings"), President of the Preston County Commission, individually. For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** the Commission's[1] motion for summary judgment as to Counts One, Two, Three, Four, Six, Seven, and Eight of the complaint.

## I. BACKGROUND

This case concerns the Commission's termination of Courtney Austin ("Austin"), the director of the Preston County Animal

---

[1] Both defendants moved for summary judgment, but the Court will refer to them collectively as "the Commission" for purposes of this opinion.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Shelter ("Shelter"). The questions presented on summary judgment include:

1) Was Austin fired for posts she wrote on Facebook in violation of the First Amendment pursuant to 42 U.S.C. § 1983;

2) Was Austin wrongfully discharged in violation of West Virginia public policy;

3) Was Austin discharged after raising issues of wrongdoing or waste in violation of the West Virginia Whistle-Blower Act, W. Va. Code § 6C-1-3(a);

4) Did the Commission and Jennings make defamatory statements regarding Austin during the Commission meeting on February 4, 2013, and thereafter in the media;

5) Did the Commission fail to pay Austin for overtime, in violation of the West Virginia Wage Payment Act, W. Va. Code § 21-5-4;

6) Did Austin have a property interest in her employment with the Commission that was terminated in violation of the Due Process Clause of the United States and West Virginia Constitutions;

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

7) Can Austin be awarded punitive damages under the West Virginia Tort Claims Act, W. Va. Code §§ 29-12A-1 et. seq.; and,

8) Is Jennings entitled to qualified immunity as a government official undertaking discretionary activities in his official capacity.

The Commission did not move for summary judgment on Austin's claim, in Count V of the Complaint, that she is entitled to overtime wages under the Fair Labor Standards Act ("FLSA"). Thus, the Court will not address that Count.

**A.     Factual Background**

The Commission hired Austin as manager of the Shelter on September 12, 2011. Initially, the Commission compensated her on an hourly basis, but, at her request, switched her compensation to a salary basis sometime during June 2012. At the time of Austin's termination, she was Shelter Director.

Around October 10, 2011, Austin created a Facebook "page" titled "Preston County Animal Shelter" within her own personal Facebook account. County Administrator Kathy Mace ("Mace") granted Austin permission to create the page. Throughout her employment, Austin posted information about the Shelter on the page. The Commission did not have administrative access rights to the page.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

On February 19, 2013, Austin posted a message on the page regarding euthanasia:

> Guess what everybody!!!  Yesterday marked 60 DAYS WITHOUT ANY EUTHANASIA!!!!!  IF YOU LIKE THIS, please comment or LIKE THIS POST SO WE CAN SHOW EVERYONE THERE ARE OTHER OPTIONS!!!!!!

The following day, Austin commented on her earlier post.  "The more people we get to like this comment, the more we can brag about it.  Get your friends to like No Euthanasia for PCAS."

On February 28, 2012, Mace gave Austin a written warning for "refusal to comply with reasonable instructions of a supervisor" regarding the Facebook post.  The written warning stated that Austin had been warned "about giving the public the impression that we are moving toward a no-kill shelter in Preston County" on previous occasions.  Mace was concerned with Austin giving the public the impression that the animal shelter was no-kill.

Austin was not formally disciplined again for almost one year. On January 23, 2013, Austin posted another message on the Facebook page:

> We are in need of several transporters this weekend for animals.  I know the weather is rough, but imagine if it's that hard on you, how rough it is on our outdoor kenneled dogs.  Additionally we have no heat in our indoor animal areas, intake and indoor kennels, and this has caused our water to freeze making it nearly impossible to perform daily tasks requiring water for

> cleaning and watering.  It is very cold, and we have
> several rescues stepping up and wanting to help more
> animals.   For sure we have rescues lined up for 6
> animals, and we need to move these dogs to get them into
> warmer homes and fosters.  If you can help us with one of
> the transports, or are headed out of town, and wouldn't
> mind a furry companion, please see if you transport for
> us.   For additional information, or to see about
> transporting in general, maybe another time, email
> pcanimalshelter@gmail.com and in the subject line title,
> use transporter/volunteer. We hope some of you are eager
> to make a new furry buddy.

Jennings saw Austin's post, and asked Mace whether the Shelter was indeed without water and heat.  Mace sent a maintenance employee to check on the conditions at the Shelter.  It is undisputed that it was a very cold day in Preston County.  The Commission received a number of telephone calls from concerned citizens who saw the post and worried that animals were suffering at the Shelter.

By way of background, it appears that in the Fall of 2011, one of the two furnaces at the Shelter failed.  A contractor connected the duct work from the failed furnace to the working furnace to pump heat throughout the Shelter, but the Commission soon began seeking ideas for a more permanent solution from various contractors.  Mace informed Austin of the bidding process and proposals.  On January 30, 2013, Austin e-mailed the Commissioners, raising several concerns about the process of soliciting ideas from

contractors.  Jennings responded to Austin's e-mail, stating that
the Commissioners "have it under control."

On Monday, January 28, 2013, after Austin's January 23, 2013,
Facebook post, she met with Jennings, Mace, Commissioner Vicki Cole
("Cole"), and Commissioner David Price ("Price").  The Commission
instructed Austin to have all future Facebook posts approved by two
of four people:  Mace, Cole, Price, or Jennings.  The Commission
also requested access to the Facebook page.  Austin explained that
the page was created within her personal Facebook account.  Austin
voiced her privacy concerns, and refused to provide her password or
other account information.  The Commissioners and Mace suggested
that Austin close the page and open a new one, but ultimately
discarded that option because the page was well-established and had
many "likes."  At the end of the meeting, the Commission, Mace, and
Austin agreed that Mace would contact an IT employee to try to find
a solution, and would relate what she found to Austin.

After the Monday meeting, Mace met with IT personnel.  On
Thursday, January 31, 2013, Mace e-mailed Austin, telling her to
change her Facebook password to "123abc," and to provide her log-in
information by Friday, February 1, 2013, at 1:30 P.M.  Austin did
not respond to the e-mail.  On Friday, Mace and the IT employee
waited for Austin's reply.  Mace called Austin and left her a

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

voicemail requesting that Austin return her call. At 1:59 P.M., Mace e-mailed Austin and again asked her to return Mace's phone call.

Finally, Mace called the Shelter and spoke to Shelter employee Elaine Smith ("Smith"). Austin said in the background to Smith, "Tell her [Mace] that I've closed the page." Mace replied "Well truly that was not what you were instructed to do, so come see me." Austin told Mace that she was unavailable until Monday, but eventually agreed to stop by the office to meet Mace.

Later that day, Austin and Smith met with Mace and Cole. Mace suspended Austin with pay until the Commission's meeting at 6:00 P.M. on the following Monday, February 4, 2013. The suspension notice stated that Austin was suspended due to her "refusal to provide passwords and emails to the Facebook account for the Preston County Animal Shelter by 1:30 p.m. on Friday, February 1, 2013."

The Commission's scheduled meeting on Monday, February 4, 2013, was set to begin at 6:30 P.M. The published agenda for the meeting does not indicate that the Commission was addressing personnel issues. The emergency meeting commenced at 5:30 P.M., and Austin accepted the Commission's offer to go into Executive Session.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Jennings and the Commission unanimously voted to terminate Austin's employment at the Shelter for insubordination. Jennings stated on the record that the Commissioners felt "they have had fraud perpetrated on them, that Mrs. Austin has knowingly and willingly allowed public false accusations against other county employees, that friends and families have been misled to believe that there was no water or heat at the shelter...."

In the days following Austin's termination, Jennings stated in both television and print media that the Commission had temporarily closed the Shelter to audit the financial records. In an article published by the Dominion Post on March 5, 2013, Jennings stated that "the bookkeeping end of it [the Shelter] was in such disarray," and noted unpaid veterinarian bills.

### B.     Procedural Background

On May 5, 2013, Austin sued the Commission and Jennings in this Court. (Dkt. No. 1). Austin's complaint contains eight counts.

In Count I, Austin alleges that the Commission disciplined her due to the content of her Facebook posts, and that the Facebook posts were protected speech within the meaning of the First Amendment to the United States Constitution, in violation of 42 U.S.C. § 1983. Id. at 9.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

In Count II, Austin alleges that she was discharged in
retribution for exercising her constitutionally protected rights,
in violation of West Virginia law and/or public policy. Id. at 10.

In Count III, Austin alleges that she was discharged after she
raised concerns over wasteful spending, adequate heat, and adequate
water at the Preston County Animal Shelter, in violation of the
West Virginia Whistle-Blower Act. Id. at 11-12.

In Count IV, Austin alleges that the Commission and Jennings
made false and defamatory statements about her during the February
4, 2013, Commission meeting. Id. at 12. Austin alleges that the
statements were published to third parties, both at the February 4,
2013, meeting and to the media through print, television, and
radio. Id. at 13. In addition, Austin alleges that the statements
were knowingly false and intentionally designed to defame her, or,
in the alternative, that they were negligent. Id.

In Count V, Austin alleges that the Commission failed to pay
her overtime, and that she was entitled to overtime as a non-exempt
worker under the FLSA. Id. at 13-14.

In Count VI, Austin alleges that the Commission failed to pay
the overtime wages owed to her under the FLSA within seventy-two

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

hours[2] of her termination, as required by the West Virginia Wage Payment and Collection Act. Id. at 15. As a result, Austin claims that she is entitled to her unpaid wages and an amount equal to three times her unpaid wages as liquidated damages. Id.

In Count VII, Austin alleges that she maintained a property interest in her employment with the Commission, and was deprived of notice and an opportunity to be heard before termination of that interest pursuant to the West Virginia Open Governmental Proceedings Act, W. Va. Code §§ 6-9a-1, et. seq. Id. at 15-16.

In Count VIII, Austin alleges that she was discharged due to her efforts to raise concerns regarding adequate food and water for the animals being sheltered in the Preston County Animal Shelter, in violation of West Virginia public policy regarding the treatment and protection of animals. Id. at 17. See W. Va. Code §§ 7-10-4; 19-20-1, et. seq.; 61-8-19.

On June 17, 2013, the Commission and Jennings filed an answer to Austin's complaint. (Dkt. No. 7). In their answer, the

---

[2] The seventy-two hour standard in W. Va. Code § 21-5-4(b) has been revised to provide that an employer must pay a discharged employee's wages in full no later than the next regular payday, or four business days, whichever comes first. The time period is irrelevant for purposes of this motion because the Commission has not paid Austin any overtime as a result of her dismissal.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Commission and Jennings advanced a number of affirmative defenses, including qualified immunity. Id. at 9-12.

Following discovery, on June 13, 2014, the Commission and Jennings filed a motion for summary judgment, alleging the issues previously mentioned. (Dkt. No. 41). On July 7, 2014, Austin responded (Dkt. No. 44), and on July 21, 2014, the Commission and Jennings filed a reply. (Dkt. No. 47). The matter is now ripe for review.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where the "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c)(1)(A), (a). When ruling on a motion for summary judgment, the Court reviews all the evidence "in the light most favorable" to the nonmoving party. Providence Square Assocs., L.L.C. v. G.D.F., Inc., 211 F.3d 846, 850 (4th Cir. 2000). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Once the moving party has made the necessary showing, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 256 (internal quotation marks and citation omitted). The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment; the evidence must be such that a rational trier of fact could reasonably find for the nonmoving party. <u>Id.</u> at 248–52.

### III. DISCUSSION

**A.    Count One:  First Amendment**

Austin alleges that the Commission violated her First Amendment rights when it disciplined her for her Facebook posts. (Dkt. No. 1 at 9-10). The Commission argues that Austin was not fired for her Facebook posts, but for insubordination. (Dkt. No. 42 at 10).

When analyzing whether a public employee's First Amendment rights were violated, the first inquiry is whether the employee was speaking as a citizen on a matter of public concern. <u>Pickering v. Board of Ed. Of Tp. High School Dist. 205, Will County, Illinois</u>,

391 U.S. 563, 574, 88 S.Ct. 1731, 1737 (1968). The threshold question of whether an employee spoke as a private citizen on a matter of public concern is a question of law for the court. Urofsky v. Gilmore, 216 F.3d 401, 406 (4th Cir. 2000).

If an employee is speaking as an employee on a matter of employment, she has no First Amendment cause of action, but if she is speaking as a citizen on a matter of public concern, "[t]he question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." Garcetti v. Ceballos, 547 U.S. 410, 418, 126 S.Ct. 1951, 1958 (2006). The Court also must determine whether the employee's speech was a substantial factor motivating her termination. Smith v. Frye, 488 F.3d 263, 267 (4th Cir. 2007).

The controlling factor in determining whether an employee is speaking as a citizen on a matter of public concern or as an employee on a matter of employment is whether the statement was made pursuant to the employee's job duties. Garcetti, 547 U.S. at 421. Whether the statement was made publicly or within the workplace is not dispositive; whether the statement concerned the subject matter of employment also is not dispositive. Id.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

In _Garcetti_, the Supreme Court of the United States held that a deputy district attorney named Ceballos, who had written a memorandum detailing serious misrepresentations in an affidavit, was not entitled to First Amendment protection after his employer reassigned him and denied him a promotion.  _Id._ at 414-15.  The Court reversed the lower court's ruling that Ceballos' speech was protected, finding that he had spoken pursuant to his official job duties as a deputy district attorney, and particularly as a calendar deputy.  _Id._ at 421.

The Court held "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  _Id._ Importantly, the Court noted that an employer's restriction of speech "that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen.  It simply reflects the exercise of employer control over what the employer itself has commissioned or created."  _Id._ at 421-22.  The Court's decision reflected the reality that an employer has the authority "to take proper corrective action" if an employee's speech "was inflammatory or misguided."  _Id._ at 423.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Court did not define the scope of an employee's duties in Garcetti, but noted that "[t]he proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." Id. at 424-25. Specifically, a public employee with "a confidential, policymaking, or public contact role" who "speaks out in a manner that interferes with or undermines the operation of the agency" enjoys "substantially less First Amendment protection than does a lower level employee." McVey v. Stacy, 157 F.3d 271, 278 (4th Cir. 1998). See Bevis v. Bethune, 232 Fed. App'x 212, 215-16 (4th Cir. May 2, 2007) (unpublished) (finding that a supervisor's statements reprimanding an employee were not a matter of public concern).

An employee may still be acting "pursuant to official duties," and therefore may be unprotected by the First Amendment, even if she engages in speech that is not part of her official job duties so long as it is in furtherance of such job duties. Weintraub v. Board of Educ. of City School Dist. of City of New York, 583 F.3d 196, 202 (2d Cir. 2010)("Our conclusion that Weintraub spoke

15

pursuant to his job duties is supported by the fact that his speech ultimately took the form of an employee grievance...."). See also Williams v. Dallas Indep. Sch. Dist., 480 F.3d 689, 694 (5th Cir. 2007) (The fact that an athletic director was not required to write memoranda as part of his job did not preclude the Court's decision that he spoke pursuant to his official duties under Garcetti because "activities undertaken in the course of performing one's job are activities pursuant to official duties.").

Even after taking the facts in the light most favorable to Austin, it is clear that she was posting on the Shelter Facebook page pursuant to her duties as Shelter Director.   Her posts therefore are not protected by the First Amendment.   Austin may have set up the Shelter Facebook page as part of her personal account, but it was not used for personal communication.   The page was titled "Preston County Animal Shelter," and Austin posted as "Preston County Animal Shelter," rather than as Courtney Austin. (Dkt. No. 47-1, Exhibit 1A).   The Shelter's informational page lists the Facebook page as the Shelter's website (Dkt. No. 47-1, Exhibit 2A), and the great majority of Austin's posts on the page use language such as "we" and "us," as opposed to "I."   (Dkt. No. 47-1, Exhibit 3A).

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Although Austin's job duties did not include maintaining a Facebook page or website when she was first hired, she assumed that task voluntarily when she asked Mace for permission to open the Facebook page. (Dkt. No. 41-3 at 48; Dkt. No. 44-5 at 36). Austin acknowledged that social media "had become a tool for shelters and animal rescues across the nation..." and that she wanted to maintain the page, even with posting restrictions, to continue to reach a wide audience. <u>Id.</u> Austin felt that the Facebook page benefitted the Shelter because she could improve adoption rates and get a quicker public response when problems arose. (Dkt. No. 47-3 at 78-79).

When Mace granted Austin permission to create the Shelter Facebook page, she told Austin to speak with IT personnel to figure out how to set the page up. (Dkt. No. 44-5 at 36). Mace felt that the page was a "useful tool" to let people know which animals were available for adoption, and when the Shelter hosted events. <u>Id.</u> at 37-38. Although the Commission did not have administrative rights over the page, it did take an interest in certain comments Austin posted. <u>Id.</u> Even before Austin was cautioned for her post about euthanasia, and then disciplined for the comments regarding the lack of heat and water at the Shelter, Mace discussed with Austin her negative dialogue with a member of the public who posted on the

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

page. Id. At that time, Mace cautioned her to "grin and bear it"
when members of the public made negative comments because the page
was "to let people know the animals we have up for adoption, [and]
the events we're doing...." Id. at 37.

Austin argues that the Commission never questioned her right
to use the Facebook page; they only cared when her message differed
from their own. (Dkt. No. 44 at 11). Indeed, Mace and the
Commissioners provided oversight when they disagreed with the
content of Austin's messages, often reading her posts and
discussing them with her when they felt the posts were
inappropriate. (Dkt. No. 44-1 at 86-87).

Austin's argument, however, lends support to the view that the
Commission had every right to control her postings because she made
them pursuant to or in furtherance of her job duties as Shelter
Director. Austin's Facebook postings as the Preston County Animal
Shelter Director were in furtherance of her job duties because she
used the postings to interest the public in adoption, and to gain
support when the Shelter encountered problems. (Dkt. No. 47-3 at
78-79). Austin was a public employee with "a public contact role"
who enjoyed "substantially less First Amendment protection than
[did] a lower level employee" because she spoke out in a manner
that undermined administration of the Shelter. McVey, 157 F.3d at

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

278.  Austin was an employee speaking pursuant to her job duties, and therefore was not entitled to the protections of the First Amendment.  The Court therefore grants the Commission's motion for summary judgment as to Count One.

**B.    Count Two:  Wrongful Discharge in Violation of West Virginia
        Public Policy**

Austin claims that the Commission terminated her employment in retribution for exercising her constitutionally protected right to freedom of speech.  (Dkt. No. 1 at 10).  The Commission argues that Austin was not terminated for her Facebook posts, but, rather, for insubordination.  (Dkt. No. 42 at 13).  In the alternative, it asserts that, even if Austin was fired for her Facebook posts, doing so did not violate her First Amendment rights because her speech was unprotected.  Id.

West Virginia recognizes a cause of action for discharge in violation of public policy when an at-will employee can show that "the firing was motivated by an intention to contravene some substantial public policy."  Harless v. First Nat. Bank in Fairmont, 162 W. Va. 116, 120 (1978).  "[T]he rule giving the employer the absolute right to discharge an at will employee must be tempered by the further principle that where the employer's motivation for the discharge contravenes some substantial public

policy principle, then the employer may be liable to the employee for damages occasioned by the discharge." Harless, 162 W. Va. at 124.  Whether public policy exists is a question of law, rather than a question of fact for the jury.  Wiley v. Asplundh Tree Expert Co., 2014 WL 1017208 (S.D.W. Va. 2014).

The burden is initially on the employee to "show that the exercise of his or her constitutional right(s) was a substantial or motivating factor for the discharge." McClung v. Marion County Com'n, 360 S.E.2d 221, 227-28 (W. Va. 1987).  The employer can then defeat the employee's claim by showing that it would have fired the employee even in the absence of the protected conduct.  Id.

In the alternative, the Commission seeks dismissal of Austin's public policy claim because she cannot state a Harless claim if the law affords her another remedy.  (Dkt. No. 47 at 8).  See Hope v. Bd. of Dirs., 2013 WL 3340699 (S.D.W. Va. July 2, 2013).  Here, the Commission argues that Austin could enforce her claim under the First Amendment, or under the West Virginia Whistle-Blower law, and therefore cannot avail herself of a Harless cause of action. (Dkt. No. 47 at 9).

The Court need not decide whether Austin's First Amendment or Whistle-Blower Act claims would vindicate her public policy claim. She argues that she was dismissed for her Facebook posts, in

violation of her First Amendment rights. (Dkt. No. 1 at 10). As
the Court has already found, however, Austin's speech was not
protected by the First Amendment. Therefore, it is irrelevant
whether Austin was terminated for posting on Facebook, as she
alleges, or for insubordination, as the Commission alleges.
Because Austin's speech was unprotected by the First Amendment, her
public policy claim fails. The Court therefore grants the
Commission's motion for summary judgment as to Count Two.

**C.   Count Three: Violation of the West Virginia Whistle-Blower Act**

In Count Three of her complaint, Austin claims that the
Commission violated the West Virginia Whistle-Blower Act, W. Va.
Code § 6C-1-1, <u>et seq.</u>, because its decision to terminate her was
based in substantial part on her decision to raise issues of
"wrongdoing" or "waste." (Dkt. No. 1 at 11-12). The Commission
argues that Austin cannot avail herself of the protection of the
Whistle-Blower Act because her Facebook posts were made to the
public, rather than to her employer. (Dkt. No. 42 at 13). In
addition, the Commission argues that Austin's posts and e-mail
about the heating and water situation are not reports of
"wrongdoing" or "waste" as those terms are defined in the Whistle-
Blower Act. <u>Id.</u> <u>See</u> W. Va. Code §§ 6C-1-2(f) and (h).

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

West Virginia's Whistle-Blower Act provides that "[n]o employer may discharge, threaten or otherwise discriminate or retaliate against an employee by changing the employee's compensation, terms, conditions, location or privileges of employment because the employee...makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste." W. Va. Code § 6C-1-3(a).

"'Wrongdoing' means a violation which is not of a merely technical or minimal nature of a federal or state statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer or appropriate authority." W. Va. Code § 6C-1-2(h). "'Waste' means an employer or employee's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from federal, state or political subdivision sources." W. Va. Code § 6C-1-2(f).

Austin argues that the Commission violated the Whistle-Blower Act when it terminated her due to two separate and distinct communications: her January 23, 2013, Facebook post regarding the lack of adequate heat and water in the shelter; and her January 30,

2013, e-mail to Jennings regarding the Commission's plans to
replace and repair the furnace. (Dkt. No. 1 at 11-12).

### 1. Austin's January 23, 2013, Facebook Post

Setting aside the Commission's argument that Austin's post did
not constitute "waste" or wrongdoing," her January 23, 2013,
Facebook post, and all previous or subsequent Facebook posts
regarding the lack of heat and water at the shelter, are not
cognizable under the Whistle-Blower Act because they were not made
"to the employer or appropriate authority." (Dkt. No. 1 at 11).
An appropriate authority is "a federal, state, county, or municipal
government body, agency or organization having jurisdiction over
criminal law enforcement, regulatory violations, professional
conduct or ethics, or waste; or a member, officer, agent,
representative, or supervisory employee of the body, agency, or
organization." W. Va. Code § 6C-1-2(a). An employer is "a person
supervising one or more employees...." W. Va. Code § 6C-1-2(c).

Austin's January 23, 2013, Facebook post was accessible to the
general public, and was not directed at Jennings or the other
Commissioners. (Dkt. No. 44-1 at 66-80). Austin stated that the
purpose of the post was to ask for help. Id. at 79 ("I was asking
people to either help us move our animals to alleviate the problem,
or to, you know, to find some other way to make things better, a

23

better means for us there."). Austin cannot and does not seriously argue that her Facebook posts were directed to her employer or an appropriate authority. <u>See</u> <u>id.</u> The Court therefore grants the Commission partial summary judgment as to Count Three insofar as Austin's Whistle-Blower claim is based on her Facebook posts.

**2. Austin's January 30, 2013, E-mail**

Turning to Austin's January 30, 2013, e-mail to Jennings, it is clear that Austin satisfies the "to the employer or appropriate authority" requirement. (Dkt. No. 44 at 14-15). It is undisputed that Austin e-mailed Jennings, her employer. (Dkt. No. 42 at 13-14; Dkt. No. 44 at 13-15; Dkt. No. 44-8 at 102). Importantly, it is undisputed that Austin reported her perceived allegations of waste in good faith. (Dkt. No. 44-8 at 102).

The Court also emphasizes that proof of retaliation under the Act does not require proof of the unlawfulness of the underlying action. Therefore, if Austin indeed reported "waste," the Commission's alleged violation of the Whistle-Blower Act occurred when it retaliated against Austin for making a good faith report of what she perceived to be waste, and it is irrelevant that the Commission did not actually break any laws. <u>See</u> <u>Kalany v. Campbell</u>, 640 S.E.2d 113, 119 (W. Va. 2006). The remaining elements in dispute are whether Austin's report was of "wrongdoing"

or "waste," and whether Austin was discharged "in retaliation" for her reports.

### a.  Wrongdoing or Waste

The parties vigorously dispute whether Austin's allegations, even if true, constituted "wrongdoing" or "waste" within the meaning of the Act.  (Dkt. No. 42 at 13-14; Dkt. No. 44 at 13-15).

As a preliminary matter, the Commission argues that Austin's communications about the process of replacing the Shelter's heating system do not highlight the type of "wrongdoing" contemplated by the statute.  (Dkt. No. 42 at 13-14).  "Wrongdoing" for purposes of the Whistle-Blower Act means "a violation," other than a merely technical or minimal violation, "of a federal or state statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interests of the public or the employer."  W. Va. Code § 6C-1-2(h).

The Commission points out that Austin has failed to show that the Commission violated a regulation or statute.  (Dkt. No. 42 at 14).  The Court agrees that Austin has failed to show "wrongdoing" within the meaning of the statute, as she has failed to point to any law, regulation, or code of ethics the Commission violated.

Austin need only prove waste <u>or</u> wrongdoing to prevail under the statute, however.

Austin's e-mail concerned the hasty and disjointed process of replacing the heating system at the Shelter. (Dkt. No. 44 at 15; Dkt. No. 44-1 at 92). Although she admittedly knew little about the Commission's bidding process, she was generally concerned that "the most efficient solution to heat" the Shelter was not outlined at the start, and that the contractors would be unable to adequately heat the area "due to poor insulation." (Dkt. No. 44-10; Dkt. No. 44-1 at 94; Dkt. No. 44-8 at 98-99). The Commission argues that Austin's concerns about the heating problem were not about "waste," because any potential loss or misuse of public funds was not "substantial." (Dkt. No. 47 at 10). The Commission points out that the job was under $ 10,000, the threshold after which the Commission is required to bid jobs competitively. <u>Id.</u> at 10-11. <u>See</u> W. Va. Code § 7-15-16.

"Waste" is defined as "an employer or employee's conduct or omissions which result in <u>substantial</u> abuse, misuse, destruction or loss of funds or resources belonging to or derived from federal, state or political subdivision sources." W. Va. Code § 6C-1-2(f) (emphasis added).

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The West Virginia legislature has not defined "substantial," but the Court defines a term according to its "ordinary and familiar significance." <u>State v. General Daniel Morgan Post No. 548, V.F.W.</u>, Syl. Pt. 4, 144 W. Va. 137 (1959). Merriam-Webster defines "substantial" as "large in amount, size, or number," "strongly made," and "being largely but not wholly that which is specified." <u>Merriam-Webster Dictionary</u>.

The federal Whistleblower Protection Act contains a similar provision, and its legislative history and subsequent body of case law are instructive. 5 U.S.C. § 2302(b)(8)(A)(ii). The federal Act provides that a government employer cannot take or fail to take a personnel action regarding an employee because of "gross mismanagement, [or] a gross waste of funds...."[3] 5 U.S.C. § 2302(b)(8)(A)(ii).

In <u>Herman v. Department of Justice</u>, the Federal Circuit, while reviewing the legislative history of the Whistleblower Protection Act, noted that "the Act was not intended to apply to disclosure of trivial or <u>de minimis</u> matters. 193 F.3d 1375, 1379 (Fed. Cir.

_____

[3] The Supreme Court of West Virginia has used "substantial" and "gross" interchangeably when analyzing whether an action is sufficient to constitute "waste" under the Whistle-Blower Act. <u>Bee v. West Virginia Supreme Court of Appeals</u>, 2013 WL 5967045 at *3 (W. Va. Nov. 8, 2013).

1999).  <u>See</u> S.Rep. No. 969, 95th Cong., 2d Sess. 8 (1978),
reprinted in 1978 U.S.C.C.A.N. 2723, 2730 (the Act should be used
to protect "the pentagon employee who discloses billions of dollars
in cost overruns, [or] the GSA employee who discloses widespread
fraud...."). The Court finds the legislative history and the case
interpreting the federal act to be persuasive authority as to the
meaning of "substantial" in the definition of waste under the West
Virginia Whistle-Blower Act.

The Court lacks the factual basis to decide whether the
potential misuse of funds was "substantial." For example, facts
like the total size of the Shelter budget, the percentage of the
overall Commission budget allocated to the Shelter, and the average
size of expenditures at the Shelter would be useful for the jury to
determine whether the potential misuse here was "substantial" as
compared to the total amount of funds the Shelter generally had at
its disposal. <u>See</u> <u>Merriam-Webster</u> (defining "substantial" as a
large part of a specified whole). The Commission's assertion that
the job was under $ 10,000, the bidding threshold, and therefore,
was not "substantial" does not hold water if an expenditure of even
one thousand dollars on a furnace would be significant as compared
to the overall budget of the Shelter.

MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Therefore, the Court finds a dispute as to a material fact: whether Austin's allegation in her e-mail identified potential misuse of funds substantial enough to constitute "waste." (See Dkt. No. 47 at 10-11; Dkt. No. 44 at 14; Dkt. No. 44-8 at 97-98).

### b.   In Retaliation

The parties also dispute the causal connection between Austin's termination and her statements in the e-mail. (Dkt. No. 42 at 10, 13; Dkt. No. 44 at 15; Dkt. No. 44-8 at 89-90). Austin's e-mail challenged the Commission's planning process, and stated that she wanted to help the Shelter save money and maximize efficiency by replacing the heating system correctly the first time. (Dkt. No. 44-10). As Austin describes, "everything changed" after the e-mail. (Dkt. No. 44 at 15). The Commission asked Austin to change her password, suspended her when she refused to do so, and then terminated her several days later. Id.

Jennings denied that Austin's termination was motivated by her January 30, 2013, e-mail. (Dkt. No. 44-8 at 89-90) ("I don't take this [e-mail] as being insubordinate at all. This has nothing to do with anything that I'm here to talk about."). Therefore, a disputed issue of material fact exists as to whether Austin's report of waste was causally connected to her termination.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Court denies the Commission's motion for summary judgment as it relates to Austin's Whistle-Blower Act claim stemming from her January 30, 2013, e-mail to Jennings because a genuine dispute of material fact exists as to whether "waste" occurred, and as to the causal connection between Austin's e-mail and her termination. Insofar as Austin's claim stems from her Facebook posts, including her January 23, 2013, post, the Court grants partial summary judgment.

**D.    Count Four:  Defamation**

Austin claims that the Commissioners, particularly Jennings, the Commission President, made false and defamatory statements about her during the February 4, 2013, Commission meeting and thereafter in the media.  (Dkt. No. 1 at 12).  The Commission argues that Jennings' statements were true and, that as a limited purpose public figure, Austin cannot prove that any of its members acted with malice.  (Dkt. No. 42 at 15-16).  In West Virginia, the tort of defamation consists of six elements:  (1) defamatory statements; (2) a non-privileged communication to a third party; (3) falsity; (4) reference to the plaintiff; (5) at least negligence on the part of the publisher; and, (6) resulting injury. Crump v. Beckley Newspapers, Inc., 320 S.E.2d 70, 77 (W. Va. 1983).

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

### 1.   Defamatory Meaning

First, the Court must decide, as a matter of law, whether the challenged statements are capable of a defamatory meaning.  Maynard v. Daily Gazette Co., 447 S.E.2d 293, 295 (W. Va. 1994).  In doing so, it differentiates between statements of fact and statements of opinion.  It is the Court's duty to determine initially whether a statement is one of fact or opinion.  Long v. Egnor, Syl. Pt. 7, 346 S.E.2d 778 (W. Va. 1986).

Statements of opinion "are absolutely protected under the First Amendment and cannot form the basis for a defamation action." Long, 346 S.E.2d at 778.  Statements of opinion are given special treatment for at least three reasons:   (1) because an opinion cannot be "false," it generally cannot be proved to be "true" either, and the defendant would therefore lose the benefit of the truth defense; (2) an opinion does not carry as much weight as a fact, and is "therefore inherently less likely to threaten the interests and values" safeguarded by defamation laws; and, (3) opinions, like most forms of speech, have an affirmative constitutional value.  Potomac Valve & Fitting Inc. v. Crawford Fitting Co., 829 F.2d 1280, 1286 (4th Cir. 1987).

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Supreme Court of the United States has described this constitutional distinction as being between "fact" and "non-fact," cautioning, however, that a "wholesale defamation exception" does not exist just because a statement is labeled an "opinion." Milkovich v. Lorain Journal Co., 497 U.S. 1, 18, 110 S.Ct. 2695, 2705 (1990). Rather, a statement of opinion "which does not contain a provably false assertion of fact is entitled to full constitutional protection." Pritt v. Republican Nat. Committee, 557 S.E.2d 853, 861 (W. Va. 2001) (quoting Maynard, 447 S.E.2d at 293).

Austin alleges that Jennings made the following statements during the February 4, 2013, Commission meeting before he terminated her employment:

> That the Preston County Commissioners feel they have had fraud perpetrated on them, that Mrs. Austin has knowingly and willingly allowed public false accusations against other county employees, that friends and family have been misled to believe that there was no water or heat at the shelter. These actions have also put the animals at risk because people have been backing off from making donations and even rescuers are backing off.... Worst of all, Mrs. Austin placed herself above all the taxpayers of this county by these false accusations.

(Dkt. No. 41-1 at 5).

In addition, Austin claims that Jennings' March 5, 2013, interview published in the Dominion Post contained false statements

that defamed her.  In that article, Jennings is quoted as saying
that "[i]t is our understanding that there is a significant
difference in the number of animal adoptions and the money that has
been collected associated with those adoptions.  The county could
have a substantial liability regarding adoption vouchers." (Dkt.
No. 44-19; <u>see also</u> Dkt. No. 44-17).  Jennings commented that
"there's not enough money in the shelter accounts, which were
managed by Austin, to cover the number of [adoption] vouchers that
should be outstanding, based on the adoption numbers she provided
in January."  <u>Id.</u>  He also stated that "the county can't find
paperwork at the shelter to validate Austin's numbers"; that "the
bookkeeping end of it was in such disarray"; and, that he had
spoken with "Preston Prosecutor Melvin C. Snyder III about the
situation but referred questions about possible charges to Snyder."
<u>Id.</u>  Jennings stated that the Shelter would be closed until April
"while [the Commission] sorts out funds."  <u>Id.</u>

    The Court must first determine whether these statements were
facts or opinions.  Pure opinions are protected from a defamation
claim, but a statement of opinion containing a "provably false
assertion of fact" is not entitled to constitutional protection.
<u>Pritt</u>, 557 S.E.2d at 861.  During the February 4, 2013, Commission
meeting, Jennings prefaces his comments with his statement that the

Commissioners "feel they have had fraud perpetrated on them...." (Dkt. No. 41-1 at 5). This statement appears to be Jennings' opinion; however, the Court must consider it in the context of the rest of Jennings' comments. Jennings goes on to state that the Commissioners feel that "Mrs. Austin has knowingly and willingly allowed public false accusations against other county employees, that friends and families have been misled to believe that there was no water or heat at the shelter." Id.

These statements, while prefaced with "the Preston County Commissioners feel..." are clearly based on underlying facts. Jennings explained that when he accused Austin of perpetrating a fraud, he meant that "she had knowingly misled the public into believing that there was no heat or water at the shelter when, in fact, there was heat and water at the shelter... [she] [k]new it wasn't true to the extent that she let it out there and continued to let that go." (Dkt. No. 44-8 at 30-31). "She allowed other members of the-county employees to, you know, get harassed over the issue knowing that what was causing the problem wasn't true." Id. at 35.

Jennings is referencing, of course, Austin's January 23, 2013, Facebook post and the public's reaction to that post. When taken as a whole, Jennings' statements during the February 4, 2013,

Commission meeting contain assertions of fact that can be proven to be true or false at trial.  Whether Austin knew that she was exaggerating the conditions at the Shelter, thereby misleading the public to garner support, is a question of fact.  Similarly, Jennings' statement that Austin's "actions have also put the animals at risk because people have been backing off from making donations and even rescuers are backing off" is a factual assertion.  Finally, Jennings stated that Austin "has placed herself above all the taxpayers of this county by these false accusations."  This statement, like those quoted above, is based on an underlying fact–whether Austin's January 23, 2013, Facebook post truthfully portrayed the situation at the Shelter.

Likewise, Jennings' statements in the March 5, 2013, <u>Dominion Post</u> article, (Dkt. No. 44-19), also quoted in an article on WDTV's website (Dkt. No. 44-17), are facts.  Jennings' assertions that "there is a significant difference in the number of animal adoptions and the money that has been collected associated with those adoptions"; that "[t]he county could have a substantial liability regarding adoption vouchers"; that "there's not enough money in the shelter accounts, which were managed by Austin, to cover the numbers of vouchers that should be outstanding..."; that "the county can't find paperwork at the shelter to validate

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Austin's numbers"; that "the bookkeeping end of it was in such disarray"; and, that Jennings "talked with Preston Prosecutor Melvin C. Snyder III about the situation but referred questions about possible charges to Snyder" are clearly not statements of opinion, but are factual assertions. (Dkt. No. 44-19). Likewise, the statement that the shelter would be closed "until April, while [the Commission] sorts out funds" is a fact. Id. Therefore, the Court declines to award summary judgment to the Commission on the basis that Jennings' statements were opinion.

### 2.   Falsity

After the Court has decided whether a statement is of fact or opinion, the plaintiff must prove the remaining elements of defamation.   The parties do not dispute whether Jennings' communications were privileged or were communicated to a third party, so the Court begins with falsity, the Commission's main contention on summary judgment. Pritt, 557 S.E.2d at 861. (Dkt. No. 42 at 15-16).   Truth is an affirmative defense to a defamation allegation because the plaintiff must prove falsity to succeed.   If the allegedly defamatory communication is true, published with good motives, and for justifiable ends, the plaintiff cannot recover, even if actual malice is present. Crump, 320 S.E.2d at 79.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Austin alleges that Jennings' statements made during the February 4, 2013, Commission meeting, and those made thereafter in the <u>Dominion</u> <u>Post</u>, quoted above, are false. (Dkt. No. 1 at 12). The Commission argues that Jennings' statements were true (Dkt. No. 42 at 15). According to the Commission, Jennings' statement that Austin perpetrated fraud upon the public meant "that the Commission and the public were 'deceived,' as there was heat and water at the shelter."[4] <u>Id.</u> Furthermore, the Commission argues that Austin's own testimony that there was "running water in a kitchen and bathroom sink" in the Shelter, and that the temperature gauge in the Shelter read 40 degrees at one point, establish that Jennings' statements were true. (Dkt. No. 41-3 at 75).

Austin has presented sufficient evidence to create a genuine dispute of a material fact. During her deposition, she testified that the furnace used to heat the indoor animal areas, intake, and indoor kennels had been removed in September of 2012. (Dkt. No. 44-1 at 67). As a result, "there was no heat from the office on down." <u>Id.</u> When questioned as to whether there was any heat at

---

[4] Jennings' statements reference Austin's January 24, 2013 Facebook post. In relevant part, it read "[a]dditionally we have no heat in our indoor animal areas, intake and indoor kennels, and this has caused our water to freeze making it nearly impossible to perform daily tasks requiring water for cleaning and watering."

all, she replied that "[i]t was pretty cold. I mean, we had to suit up like we were outside. We had heavy coats and jackets and gloves." Id. at 68. Austin testified that on the day of her Facebook post she hadn't read the thermometer in the area, but that water pipes in multiple locations froze and burst. Id. at 68-72.

In addition, Austin explained that the running water in the kitchen and bathroom sinks was insufficient for the Shelter's daily cleaning needs, and that there "was no access to water in that lower area." Id. at 74-75. When asked if she had embellished or overstated the conditions at the Shelter to attract public attention, Austin denied doing so, reiterating that "[t]here was a heat problem, and water froze because of the heat or lack of heat." Id. at 79-80.

The Commission bases its summary judgment motion on the truth of Jennings' statements, and alleges that Jennings' statements were not false because Austin's Facebook post was inaccurate. Austin has established a genuine dispute as to whether there was heat and water at the shelter at the time of her Facebook post, a material fact in her dispute with the Commission and Jennings. As a result, the Court denies the Commission's motion for summary judgment as to Count Four.

### 3.    Limited Purpose Public Figure

The Court will also address the Commission's contention that Austin was a limited purpose public figure. (Dkt. No. 42 at 15-16). A plaintiff is a public figure for a limited range of issues when she "voluntarily injects [herself] or is drawn into a particular public controversy...." <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323, 351, 94 S.Ct. 2997, 3013 (1974).

A plaintiff is a limited purpose public figure if the defendant proves that:

> (1) the plaintiff voluntarily engaged in significant efforts to influence a public debate-or voluntarily assumed a position that would propel him to the forefront of a public debate-on a matter of public concern;
> (2) the public debate or controversy and the plaintiff's involvement in it existed prior to the publication of the allegedly libelous statement; and
> (3) the plaintiff had reasonable access to channels of communication that would permit him to make an effective response to the defamatory statement in question.

<u>Wilson</u>, 588 S.E.2d at 206. Whether a person is a limited purpose public figure is a question of law. <u>Carr v. Forbes, Inc.</u>, 259 F.3d 273, 278 (4th Cir. 2001).

Most of the parties' disagreement surrounds the first element, whether Austin "voluntarily engaged in" significant efforts to influence a public debate, or "voluntarily assumed a position" that

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

would propel her to the forefront of a public debate. (Dkt. No. 42 at 15-16; Dkt No. 44 at 15-18; Dkt. No. 47 at 11-16). The Commission bases its argument on a January 29, 2013, e-mail sent from Austin with her Shelter e-mail account to ten recipients. (Dkt. No. 47 at 12; Dkt. No. 47-1 at 40). Many of the e-mail recipients are affiliated with animal organizations or shelters, and many are community members concerned with animal safety and welfare. (Dkt. No. 47 at 13; Dkt. No. 47-1 at 40). In that e-mail, Austin updates the recipients as to her employment status following her meeting with Mace and the commissioners.

> I have not been fired but am under what feels like restriction....I am not allowed to post on Facebook without the Commission approval of post first. The [C]ommissioners are very upset with what info I have shared about the furnace situation, even though they knew we hadn't had heat since Sept., in those areas. You guys know how screwed up our [C]ommissioners are, and how much they really don't care about animals in general. The only Commissioner that didn't jump down my back was Dave Price....I'm not the type of person to wait for change, if you want something to happen, remember, you have to be the force to make a difference and see the change. That being said, I have to keep a low profile and play it cool for a while, so I'm going to keep a low profile. We still have plenty of work and improvements to make up here, and we are going to keep doing that.

Dkt. No. 47-1 at 40.

Many of the recipients replied, offering support and encouragement to Austin. Id. at 41-43. One recipient, Sheree

40

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Nixon from Pet Helpers Inc., responded that the Commissioners wouldn't look bad "[i]f they were doing their job..." because then "the furnace would not be an issue." Id. at 41. Other recipients discuss whether Austin can get around the posting restriction on the Shelter Facebook page, asking if she "can at least post about the pets without approval," and advising her that just because she was restricted from posting on Facebook "[d]oesn't mean the rest of us can't...[a]nd [information] doesn't necessarily need to be posted on the [Shelter] page...." Id. at 41-42. One recipient, "Trish M" from Happy Dog Rescue, advises Austin that "[t]here's ways to get the word out without the [C]ommissioners seeing what's posted. Especially if the Preston Co page is set up so only mods can post...so nobody can forward it there without her approval." Id. at 42.

While Austin claims that she neither engaged in nor assumed a position in a public debate, the record suggests that she did both. Austin emphasizes that she did not encourage her friends and family to create a "Support Courtney Austin" Facebook page, or to attend the February 4, 2013, Commission meeting to speak on her behalf. (Dkt. No. 44 at 18). Austin's argument disregards the fact that she engaged in a public debate by (1) posting about the Shelter conditions on the Shelter Facebook page; and, (2) furthering the

debate about the Commission's actions at the Shelter by sending her January 29, 2013, e-mail.

It is clear from the context of Austin's e-mail that the recipients had previous knowledge of Austin's issues with the Commission, and that the January 29, 2013, e-mail was merely a continuation of an earlier discussion about the wisdom of the Commission's decisions. Furthermore, it is clear that the debate was not just about Austin's employment, but was about the welfare of the animals at the Shelter, a matter of public concern.

Second, Austin's engagement in this debate predated Jennings' allegedly libelous statements. Austin's e-mail is dated January 29, 2013, after her meeting with the Commissioners discussing the posting restriction. (Dkt. No. 47-1 at 40). Jennings' statements, however, occurred during the February 4, 2013, Commission meeting, and thereafter in the news media. (Dkt. No. 44-1 at 5; Dkt. No. 44-19).

Finally, Austin had access to channels of communication to rebut Jennings' statements. She could have remained in the February 4, 2013, meeting and spoken publicly to defend herself, as many of her friends and family did. (Dkt. No. 41-1 at 6-8). Likewise, she could have contacted the Dominion Post or other news media to provide her side of the story. In fact, the Dominion Post

stated in its article that it contacted Austin's attorney, but had not received any response. (Dkt. No. 44-19). The Court therefore holds that Austin is a limited purpose public figure, and must prove by clear and convincing evidence that Jennings spoke with knowledge that his statement was false, or with reckless disregard as to whether it was false or true. <u>State ex rel. Suriano v. Gaughan</u>, 480 S.E.2d 548, 556 (W. Va. 1996).

E.    **Count Six: The West Virginia Wage Payment and Collection Act**

Austin alleges that the Commission violated the West Virginia Wage Payment and Collection Act (the "Wage Payment Act"), W. Va. Code § 21-5-1, <u>et seq.</u>, when it failed to pay overtime allegedly owed to her under the federal Fair Labor Standards Act ("FLSA"). (Dkt. No. 1 at 15). The Wage Payment Act provides that "[w]henever a person, firm or corporation discharges an employee, the person, firm or corporation shall pay the employee's wages in full no later than the next regular payday or four business days, whichever comes first...." W. Va. Code § 21-5-4(b). If the person, firm or corporation fails to pay the discharged employee within four days, he or she is entitled to "three times that unpaid amount as liquidated damages...." W. Va. Code § 21-5-4(e).

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

As a preliminary matter, Austin was entitled to overtime wages under the FLSA for all hours worked over forty hours in a work week.  Austin was an "employee" under the FLSA.  29 U.S.C. § 203(e)(2)(C).  While employers must pay overtime wages to most hourly employees who work more than forty hours in a work week, the majority of salary employees are exempt from the maximum hours and minimum wage provision of the FLSA.  29 U.S.C. § 213(a).

When Austin switched from an hourly employee status to a salary employee status under the FLSA, however, she did not meet the exemption provision of 29 C.F.R. § 541.600.  Section 541.600 provides that an employee's salary must average at least $ 455 per week to qualify as exempt from the FLSA's minimum wage and maximum hours provision.  29 C.F.R. § 541.600.  Austin was paid a salary of $ 23,400 per year, (Dkt. No. 1 at 2), which averaged out to $ 450 per week, bringing her right below the $ 455 cut off in § 541.600.  Therefore, Austin was entitled to overtime pay for all hours over forty she worked in one workweek.  29 U.S.C. § 207(a)(1).

The Commission did not move for summary judgment on Austin's FLSA claim in Count Five.  Austin's claim in Count Six is that, although the FLSA governed her overtime wages as an employee of a political subdivision, the Wage Payment Act governed the timing of

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

those payments, and therefore, the treble damages provision in the Wage Payment Act applied to her. (Dkt. No. 1 at 15).

The Commission, however, contends that political subdivisions are not governed by the Wage Payment Act, and that the FLSA both creates Austin's right to overtime pay and provides the exclusive remedy for recovery of that pay. (Dkt. No 42 at 17). The Wage Payment Act, by its terms, applies to "a person, firm, or corporation." W. Va. Code § 21-5-4(b). An "employer" is likewise defined as "any person, firm or corporation employing any employee." W. Va. Code § 21-5-1(m). A "firm" includes "any partnership, association, joint-stock company, trust division of a corporation, the administrator or executor of the estate of a deceased individual, or the receiver, trustee, or successor of any of the same, or officer thereof, employing any person." W. Va. Code § 21-5-1(a).

A political subdivision is suspiciously absent from the otherwise expansive definition found in § 21-5-1(m). This absence is even more notable when the Court considers W. Va. Code § 21-5-5a, a provision that changes the definition of an "employer" only for purposes of §§ 5(b), (c), and (d), which govern an employer's use of lie detectors. There, an "employer" includes any "individual, person, corporation, department, board, bureau,

agency, commission, division, office, company, firm, partnership, council or committee of the state government; public benefit corporation, **public authority or political subdivision of the state**; or other business entity, which employs or seeks to employ an individual or individuals." W. Va. Code § 21-5-5a(1) (emphasis added).

The West Virginia legislature provided two different definitions of an employer within Article 5, lending force to the Commission's argument that the legislature purposefully exempted political subdivisions from liability under the Wage Payment Act.

This conclusion is bolstered by the few cases on point. Where the FLSA creates the right to overtime for employees, it also "provides the exclusive remedy for the recovery of such premium pay." Westfall v. Kendle Intern., CPU, LLC, 2007 WL 486606 at * 15 (N.D.W. Va. Feb. 15, 2007) (holding that the plaintiff may not pursue her overtime claim under the Wage Payment Act as a matter of law because overtime pay under the FLSA applies). See also Scruggs v. Skylink, Ltd., 2011 WL 6026152 at *9 (S.D.W. Va. Dec. 2, 2011) (denying the plaintiffs' claims under the Wage Payment Act because they were relying on the FLSA for their rights, but invoking the Wage Payment Act as a source of remedies).

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

In Anderson v. Sara Lee Corp., the United States Court of Appeals for the Fourth Circuit drew a distinction between state laws that grant more maximum hour and minimum wage protections than the FLSA, and state laws that govern only the source of remedies for a FLSA violation. 508 F.3d 181, 193-94 (4th Cir. 2007). The Fourth Circuit found that the former type of state law was not preempted under the FLSA, but that the latter type was preempted because "in the FLSA Congress manifested a desire to exclusively define the private remedies available to redress violations of the statute's terms." Id. at 194 (citing Kendall v. City of Chesapeake, Va., 174 F.3d 437, 439 (4th Cir. 1999)). Therefore, the Court grants the Commission's motion for summary judgment as to Count Six.

**F.    Count Seven:  Violation of Due Process**

Austin claims that the Commission violated her due process rights by terminating her employment during a hearing where personnel matters were not placed on the agenda.[5] (Dkt. No. 1 at

---

[5] According to Austin, the Commission was required under the West Virginia Open Governmental Proceedings Act, W. Va. Code § 6-9a-1, et seq., to post an agenda detailing the actions that would be taken during the February 4, 2013, meeting. (Dkt. No. 1 at 16). Because the agenda did not mention Austin, she contends, the Commission was prohibited from taking any action on her employment. The Court need not decide whether the Commission violated the Open Governmental Proceedings Act because Austin does not have a

15-16).   The  Commission  disputes  that  Austin  had  a  property interest  in  her  employment  in  the  first  place,  and  argues  that Austin was a statutorily at-will employee. (Dkt. No. 42 at 17-18).

First, an employee challenging her termination on due process grounds must show a "legitimate claim of entitlement" to a property interest in employment.  The Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709 (1972).  A property interest can be created by statute, ordinance, or contract, either express or implied.  "The sufficiency of the claim of entitlement must be decided by reference to state law."  Pittman v. Wilson County, 839 F.2d 225, 227 (4th Cir. 1988).

Second, if an employee has a protected property interest, the Court must then determine whether sufficient process was provided before the employee was terminated.  See Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903 (1976).   Under the Mathews framework, the Court must consider three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and, (3) "the [g]overnment's

protected  property  interest  in  continued  employment  with  the
Commission.

interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Id. at 335, 903.

Austin did not have a "legitimate claim of entitlement" to a property interest in continued employment with the Commission. The parties do not dispute that Austin was hired without an employment contract. (Dkt. No. 42 at 17-18; Dkt. No. 1 at 15-17). Austin claims that she is "statutorily entitled" to employment because the employee handbook set forth a progressive disciplinary system. (Dkt. No. 44 at 21). Austin cites several cases to support her alternative argument that she is "statutorily entitled" to employment as a "permanent civil service" employee. Those cases, however, are inapposite because they describe classified civil service jobs where the term of employment is specified by statute. Swiger v. Civil Service Com'r, 179 W. Va. 133, 136 (W. Va. 1987).

In contrast, Austin is a statutorily at-will employee under W. Va. Code § 7-1-3m. Section 7-1-3m is part of Article 1, Chapter 7 of the West Virginia Code, which describes the general powers of county commissions. Section 7-1-3m, "Authority to employ, fix compensation for and discharge personnel," provides that "[s]uch [county] courts **shall have authority to discharge at their will and**

**pleasure**, any such personnel by filing with their clerks a statement in writing showing such action, to be entered in, and made a part of, their order book or other daily record book." W. Va. Code § 7-1-3m (emphasis added). See <u>Williams v. Brown</u>, 437 S.E.2d 775, 778 (W. Va. 1993) (ruling that the phrase "serve at the pleasure of the attorney general" indicates the Legislature's intent to give the attorney general unfettered control over employment decisions).

Austin's claim that the Commission's employee handbook created her entitlement to continued employment likewise fails. The handbook states prominently and repeatedly that Commission employees are at-will. (Dkt. No. 44-18 at 1, 3, 5). Furthermore, the terms of an employee handbook cannot override state law. <u>Darlington v. Mangum</u>, 450 S.E.2d 809, 812-13 (W. Va. 1994). This means that any promises of employment made to at-will employees who are not statutorily covered by the civil service cannot override state law to the contrary. <u>Freeman v. Poling</u>, 338 S.E.2d 415, 419 (W. Va. 1985). It is unnecessary to consider whether Austin was provided with notice and an opportunity to be heard under the West Virginia Open Governmental Proceedings Act because she does not have a protected property interest in continued employment.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Therefore, the Court grants the Commission's motion for summary judgment as to Count Seven.

**G.   Count Eight:  Wrongful Discharge in Contravention of West Virginia Public Policy Regarding the Treatment and Protection of Animals**

Austin claims that she was terminated for attempting to raise concerns over insufficient heat and water for the animals at the Shelter, a condition that violated West Virginia public policy regarding the treatment and protection of animals. (Dkt. No. 1 at 17).  The Commission argues that Austin fails to state a claim. (Dkt. No. 42 at 18).

West Virginia recognizes a cause of action for discharge in violation of public policy when an at-will employee can show that "the firing was motivated by an intention to contravene some substantial public policy."  Harless v. First Nat. Bank in Fairmont, 162 W. Va. 116, 120 (1978).  "[T]he rule giving the employer the absolute right to discharge an at will employee must be tempered by the further principle that where the employer's motivation for the discharge contravenes some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by the discharge."  Harless, 162 W. Va. at 124.  Whether public policy exists is a question of law, rather

than a question of fact for the jury. <u>Wiley v. Asplundh Tree
Expert Co.</u>, 2014 WL 1017208 (S.D.W. Va. 2014).

The burden is initially on the employee to "show that the
exercise of his or her constitutional right(s) was a substantial or
motivating factor for the discharge." <u>McClung v. Marion County
Com'n</u>, 360 S.E.2d 221, 227-28 (W. Va. 1987). The employer can then
defeat the employee's claim by showing that it would have fired the
employee even in the absence of the protected conduct. <u>Id.</u>

Austin points to W. Va. Code § 61-8-19 as a source of public
policy. As relevant here, § 61-8-19 makes it unlawful for any
person to intentionally, knowingly, or recklessly "[w]ithhold
proper sustenance, including food or water...[and] [s]helter that
protects [animals] from the elements of weather...." W. Va. Code
§ 61-8-19(a)(1)(C)(I)-(ii). Any person who violates § 61-8-
19(a)(1) is guilty of a misdemeanor, and cannot possess, own, or
reside with an animal for five years after conviction. § 61-8-
19(b), (I). Austin also identifies § 7-10-4, which provides
authority for a humane officer to take custody of and care for
neglected or abandoned animals. W. Va. Code § 7-10-4(a). Austin
also points to § 19-20-1, which provides that dogs over the age of

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

six months are personal property subject to taxation.[6] W. Va. Code § 19-20-1. Finally, § 7-10-2 imposes a duty on humane officers to "prevent the perpetration or continuance of any act of cruelty upon any animal..." and vests in humane officers the right to arrest any person they believe, upon probable cause, to be engaged in cruel or forbidden practices. W. Va. Code § 7-10-2(a). (Dkt. No. 44 at 24).

Although Austin has identified public policy regarding the treatment and protection of animals, it is the Court's duty to determine whether it is "substantial" public policy. <u>Birthisel v. Tri-Cities Health Services Corp.</u>, 424 S.E.2d 606, 612 (W. Va. 1992). The West Virginia Supreme Court of Appeals used the term "substantial public policy...to exclude claims that are based on insubstantial considerations." <u>Id.</u> An employer should not be held liable "where a public policy standard is too general to provide any specific guidance or is so vague that it is subject to different interpretations." <u>Id.</u> The existence of a substantial

---

[6] It is unclear why § 19-20-1, a provision requiring dogs over six months of age to be taxed, is relevant to Austin's claim. Therefore, the Court relies on the other code provisions cited by Austin.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

public policy is to be construed narrowly. <u>Johnson v. Verizon Communications</u>, 2011 WL 4352405 at *4 (S.D.W. Va. Aug. 25, 2011).

The Supreme Court of Appeals of West Virginia has adopted a four-part test to determine whether an employee has successfully presented a claim for wrongful discharge in violation of public policy. <u>Feliciano v. 7-Eleven, Inc.</u>, 559 S.E.2d 713, 723 (W. Va. 2001). First, did a clear public policy exist, and was it manifested in a state or federal constitution, statute or regulation, or in the common law? ("The clarity element"). Second, would dismissing employees under circumstances like those involved in the plaintiff's dismissal jeopardize the public policy? ("The jeopardy element"). Third, was the plaintiff's dismissal motivated by conduct relating to the public policy? ("The causation element"). And, finally, did the employer lack an overriding legitimate business justification for the dismissal? ("The overriding justification element"). <u>Id.</u>

First, Austin points to a clear public policy, enumerated in several West Virginia statutes. Section 61-8-19 prohibits cruelty and mistreatment of animals, whereas §§ 7-10-2 and 7-10-4 vest humane officers with rights and duties to care for abandoned or neglected animals. Austin has satisfied the clarity element by

identifying clear public policy, enumerated in three separate statutes.

The Court must also determine, however, whether these statutes represent substantial public policy. A substantial public policy standard cannot be "too general to provide any specific guidance or...so vague that it is subject to different interpretations," and must "provide specific guidance to a reasonable person." Birthisel, 424 S.E.2d at 612. All three statutes enumerate specific duties on the part of humane officers or specific prohibited acts on the part of the public. The statutes were legislatively enacted, a factor the Supreme Court of Appeals of West Virginia noted as significant in Birthisel. Id. The Court therefore finds that §§ 61-8-19, 7-10-2, and 7-10-4 represent substantial public policy.

Austin must also show that dismissing employees under circumstances similar to hers would jeopardize the public policy, and that her discharge was causally connected to the public policy violation (the jeopardy and causation elements). Austin claims that her dismissal was motivated by her attempts to raise concerns over insufficient heat and water for the animals, and that the Commission's actions were in retaliation for her attempt to protect the animals in the Shelter. (Dkt. No. 1 at 17). Of course, the

55

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Commission vigorously disputes Austin's allegations, and responds that it is "undisputed that there was no animal cruelty in this matter." (Dkt. No. 47 at 23).

The Court will not dismiss Austin's public policy claim on summary judgment because there are disputed material facts, both regarding why Austin was terminated, and whether the alleged lack of heat and water constituted cruel conditions for the animals in the Shelter in contravention of the statutes named above. (Dkt. No. 41-3 at 67-72). Therefore, the Court denies the Commission's motion for summary judgment as to Count Eight.

**H.    Qualified Immunity**

The Commission moves for summary judgment as to Austin's claims against Jennings in his individual capacity because Jennings is entitled to qualified immunity for his statements and actions. (Dkt. No. 42 at 19). Austin alleges that Jennings (1) violated both her First Amendment right to freedom of speech and her Fourteenth Amendment right to due process, under § 1983; (2) violated her statutory right under the West Virginia Whistle-Blower Act to report instances of waste or wrongdoing; (3) violated her right to report animal mistreatment pursuant to West Virginia

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

public policy; and, (4) violated her right not to be defamed. (Dkt. No. 1 at 9-18; Dkt. No. 44 at 25).

The Court has already granted the Commission's motion for summary judgment as to Austin's First Amendment and due process claims, both cognizable under § 1983. Therefore, it is not necessary to analyze Jennings' qualified immunity defense under federal law as to those claims. Although the Commission's claim for qualified immunity as to Austin's Whistle-Blower, public policy, and defamation counts is governed by West Virginia law, the Commission's motion did not specifically assert the West Virginia Governmental Tort Claims and Insurance Reform Act ("the Tort Claims Act") as a defense to Jennings' liability. W. Va. Code § 29-12A-5. (Dkt. No. 42 at 19; Dkt No. 47 at 24). Nonetheless, it is appropriate to consider whether Jennings is immune under the Tort Claims Act.

Whether an official is immune is a question of law for the court. <u>Wilcox v. City of Sophia ex rel. Barr</u>, 2014 WL 1272513 at *3 (W. Va. Mar. 28, 2014). An employee of a political subdivision is immune from liability under the Tort Claims Act unless one of three scenarios applies: (1) the employee's acts or omissions were "manifestly outside the scope of employment or official responsibilities"; (2) the employee's acts or omissions "were with

malicious purpose, in bad faith, or in a wanton or reckless manner"; or, (3) the legislature has expressly imposed liability on the employee by another provision of the code. W. Va. Code § 29-12A-5(b) (emphasis added). An employee includes "any elected or appointed official of a political subdivision." W. Va. Code § 29-12A-3(a).

Austin alleges that Jennings violated her statutory right to report instances of wrongdoing or waste, her right to report animal mistreatment, and her right not to be defamed. (Dkt. No. 44 at 25). Each of these allegations stems from the same operative facts: (1) Austin's January 23, 2014, Facebook post regarding the lack of heat and water at the shelter (Dkt. No. 44-1 at 67-80); (2) Austin's January 30, 2013, e-mail to Jennings regarding the furnace replacement process (Dkt. No. 44 at 15; Dkt. No. 44-1 at 92); and, (3) Jennings' statements at the February 4, 2013, Commission meeting where Austin was terminated, and his interview in the Dominion Post (Dkt. No. 41-1 at 207; Dkt. No. 44-19).

As a preliminary matter, Jennings possesses statutory authority as President of the Commission to discipline and fire employees. W. Va. Code § 7-1-3m. (Dkt. No. 44-8 at 16-19). It is therefore unlikely that Jennings acted "manifestly outside the scope of his employment" when he terminated Austin.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Austin need only show that one element of § 29-12A-5(b) exists, however, to preclude Jennings from receiving immunity. The parties still contest the underlying facts needed to determine whether Jennings' actions were malicious, in bad faith, or wanton and reckless. W. Va. Code § 29-12A-5(b)(2). Wanton or reckless behavior means that the person "has intentionally done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." Holsten v. Massey, 490 S.E.2d 864, 878 (W. Va. 1997).

Immunity is only appropriate "when the plaintiff has not demonstrated any genuine issues of material fact which must be resolved to determine whether the defendant's actions were reasonable under clearly established law." Ball v. Baker, 2012 WL 4119127 at * 13 (S.D.W. Va. Sept. 18, 2012) (quoting Kelly v. City of Williamson, 655 S.E.2d 528, 534 (W. Va. 2007)).

In her complaint, Austin alleges that Jennings' actions were "taken with malicious purpose, in bad faith and in a wanton and reckless manner." (Dkt. No. 1 at 2, 12, 13, 17). There is a factual dispute about this, and a jury could find that Jennings acted maliciously, in bad faith, and in a wanton and reckless manner when he spoke about Austin at the Commission meeting and in

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

the Dominion Post.  It could also find that he maliciously, in bad
faith, or in a wanton and reckless manner terminated her employment
in retaliation for the January 23, 2013, Facebook post and January
30, 2013, e-mail.  On that basis, the Court cannot determine that
Jennings is entitled to qualified immunity under W. Va. Code § 29-
12A-5(b) as a matter of law and reserves the matter until the
contested facts are resolved by a jury.  It therefore denies the
Commission's motion for summary judgment as to qualified immunity.

## I.   Punitive Damages

The Commission claims that it is protected from an award of
punitive damages by W. Va. Code § 29-12A-1 et seq. (Dkt. No. 42 at
18).   Section 29-12A-7 prohibits punitive damages against a
political subdivision.  W. Va. Code § 29-12A-7(a).

Austin admits that her punitive damages claim is only
cognizable against Jennings in his individual capacity.  (Dkt. No.
44 at 24).  In Huggins v. City of Westover Sanitary Sewer Board,
the West Virginia Supreme Court of Appeals implied that when an
employee of a political subdivision is named in his individual
capacity, rather than his official capacity, punitive damages are
available.  712 S.E.2d 482, 487-88 (W. Va. 2011).

Austin has remaining in her complaint three claims that could
potentially result in punitive damages liability for Jennings:  her

Whistle-Blower Act claim, her defamation claim, and her <u>Harless</u> claim.

### 1. Whistle-Blower Act Claim

In Count Three, Austin claims that Jennings fired her in retaliation for reporting waste or wrongdoing under the West Virginia Whistle-Blower Act. The Whistle-Blower Act enumerates various remedies the Court may award a successful plaintiff, including reinstatement of the employee, back pay, full reinstatement of fringe benefits and seniority rights, actual damages, the cost of litigation, attorney's fees, and witness fees, as the Court deems appropriate. W. Va. Code § 6C-1-5. <u>Thompson v. Town of Alderson</u>, 600 S.E.2d 290, 293 (W. Va. 2004) (enumerating the remedies available under the Whistle-Blower Act).

The express provisions of the Whistle-Blower Act control the remedies available to a plaintiff. W. Va. Code § 6C-1-5. Therefore, punitive damages are not available to Austin as to her Whistle-Blower Act claim, and the Court grants partial summary judgment to Jennings on that basis.

### 2. Defamation Claim

In Count Four, Austin alleges that Jennings defamed her during the February 4, 2013, Commission meeting, and thereafter in

interviews with news media.  As explained earlier, Austin is a limited purpose public figure for purposes of her defamation claim. Therefore, to recover punitive damages, she must show actual malice—"that the defendant published false and defamatory material either knowing that it was false or with reckless disregard of whether it was false, and with an intent to injure the plaintiff"—by clear and convincing evidence.  <u>Reuber v. Food Chemical News, Inc.</u>, 925 F.2d 703, 708 (4th Cir. 1991); <u>Hinerman v. Daily Gazette Co., Inc.</u>, 423 S.E.2d 560, 579 (W. Va. 1992).

If a punitive damages award is justified under the malice standard, the Court must then examine the amount of the award pursuant to certain aggravating and mitigating criteria.  <u>Perrine v. E.I. du Pont de Nemours and Co.</u>, 694 S.E.2d 815, 882 (W. Va. 2010).  The West Virginia Supreme Court of Appeals cautions that punitive damages must "bear a reasonable relationship to the potential of harm caused by the defendant's actions," and "a reasonable relationship to actual damages."  <u>Garnes v. Fleming Landfill, Inc.</u>, 413 S.E.2d 897, 908 (1991).  A jury cannot return an award for punitive damages unless it finds compensatory damages. <u>Id.</u>  The jury may consider "the reprehensibility of the defendant's conduct," whether the defendant profited from his wrongful conduct, and the financial position of the defendant.  <u>Id.</u>

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

In addition, the Court must consider several factors when reviewing a jury award of punitive damages: the cost of litigation, any criminal sanctions also imposed on the defendant, any other civil actions against the defendant, and "the appropriateness of punitive damages to encourage fair and reasonable settlements when a clear wrong has been committed." Id. at 909. The Court may consider the defendant's insurer's ability to pay, but it should "not have the subject of insurance raised before the jury." Id. at 910. West Virginia courts set a clear outer limit on the ratio of punitive damages to compensatory damages. See TXO Production Corp. v. Alliance Resources Corp., 419 S.E.2d 870, 888-890 (distinguishing between "really mean" and "really stupid" defendants when deciding the outer limit of punitive damage awards). Therefore, if Austin prevails in her defamation claim, she can attempt to hold Jennings liable for punitive damages as to that claim.

**3.   Harless Claim**

In Count Eight, Austin alleges that Jennings discharged her in violation of West Virginia public policy regarding the safety and treatment of animals. Punitive damages are available under Harless, but only in circumstances where an employer's conduct is

"wanton, willful or malicious." <u>Harless v. First National Bank in
Fairmont</u>, 289 S.E.2d 692, 703 (W. Va. 1982)(citing <u>O'Brien v.
Snodgrass</u>, Syl. Pt. 1, 16 S.E.2d 621 (W. Va. 1941)).

A plaintiff's recovery of punitive damages is not automatic
and must be limited to the appropriate circumstances. "The mere
existence of a retaliatory discharge will not automatically give
rise to the right to punitive damages. The plaintiff must prove
further egregious conduct on the part of the employer." <u>Id.</u> at
703. For example, punitive damages may arise under <u>Harless</u> if "the
employer circulates false or malicious rumors about the employee
before or after the discharge or engages in a concerted action of
harassment to induce the employee to quit or actively interferes
with the employee's ability to find other employment." <u>Id.</u> at 703,
fn. 19.

Of particular concern is a situation where a plaintiff
recovers for emotional distress because "a jury may weigh the
defendant's conduct in assessing the amount of damages and to this
extent [,] emotional distress damages may assume the cloak of
punitive damages." <u>Harless</u>, 289 S.E.2d at 702. Put another way,
if a plaintiff recovers for emotional distress under <u>Harless</u> "when
the distress arises out of the extreme and outrageous conduct
intentionally caused by the defendant, damages awarded for the tort

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

of outrageous conduct are essentially punitive damages. Therefore, in many cases emotional distress damages serve the policy of deterrence that also underlies punitive damages."[7] Dzinglski v. Weirton Steel Corp., Syl. Pt. 8, 445 S.E.2d 219, 222 (W. Va. 1994). The West Virginia Supreme Court of Appeals cautions against "stack[ing] punitive damages upon punitive damages" in this manner. Id. at 229.

Although Austin is permitted to argue for punitive damages from Jennings under Harless, her right to recover is not automatic. As stated above, Austin must show that Jennings engaged in wanton, wilful, or malicious conduct.

For the reasons stated above, the Court:

• grants the motion for summary judgment on Austin's punitive damages claim as to the Commission;

• denies the motion as to Jennings in his individual capacity as to Austin's Harless and defamation claims; and

---

[7] In Tudor v. Charleston Area Medical Center, Inc., the West Virginia Supreme Court of Appeals sought to clarify situations where this double recovery is impermissible. 506 S.E.2d 554, 574 (W. Va. 1997). When the jury is presented with an intentional infliction of emotional distress claim without physical trauma or psychiatric proof of emotional or mental trauma, any damages awarded by the jury necessarily encompass punitive damages. Id. at 574-75.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

- grants the motion as to Jennings in his individual capacity as to Austin's Whistle-Blower Act claim.

### IV. CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART** and **DENIES IN PART** the Commission's motion for summary judgment. Specifically, it:

- **GRANTS** the motion as to Counts One, Two, Six, and Seven;

- As to Count Three, it **GRANTS IN PART** the motion insofar as it relates to Austin's Facebook posts, and **DENIES IN PART** the motion insofar as it relates to Austin's e-mail;

- **DENIES** the motion as to Counts Four and Eight;

- **FINDS** that §§ 61-8-19, 7-10-2, and 7-10-4 represent substantial public policy;

- As to Jennings' defense of qualified immunity under 42 U.S.C. § 1983, it **DENIES AS MOOT** the Commission's motion based on the dismissal of Counts 1 and 7;

- As to Jennings' defense of qualified immunity under the West Virginia Tort Claims Act, it **DENIES** the Commission's motion;

- **GRANTS** the Commission's motion as to its immunity from punitive damages liability;

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

- **DENIES** the motion as to Jennings' immunity from punitive damages liability for Austin's <u>Harless</u> and defamation claims; and,

- **GRANTS** the motion as to Jennings' immunity from punitive damages liability for Austin's Whistle-Blower claim.

   It is so **ORDERED**.

   The Court directs the Clerk to transmit copies of this Order to counsel of record.

DATED: October 14, 2014.


                                        /s/ Irene M. Keeley
                                        IRENE M. KEELEY
                                        UNITED STATES DISTRICT JUDGE